1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2
      ----------------------------------------------------
3                                      )
      United States of America,        )   File No. 10-165
4                                      )       (DSD/JJK)
                      Plaintiff,       )
5                                      )
            vs.                        )
6                                      )
      Nathan Daniel Jesh,              )   Minneapolis, MN
7                                      )   November 30, 2010
                      Defendant.       )   9:45 a.m.
8                                      )
      ----------------------------------------------------
9
                 BEFORE THE HONORABLE DAVID S. DOTY
10             UNITED STATES DISTRICT COURT JUDGE
                     **(ARRAIGNMENT & GUILTY PLEA)**
11
      APPEARANCES
12    For the Plaintiff:     United Sates Attorney's Office
                             CHARLES KOVATS, JR,  AUSA
13                           600 U.S. Courthouse
                             300 South Fourth Street
14                           Minneapolis, MN 55415

15    For the Defendant:     Federal Defender's Office
                             LYONEL NORRIS, ESQ.
16                           Suite 179
                             300 South Fourth Street
17                           Minneapolis, MN 55415

18

19

20

21    Court Reporter:        Lorilee K. Fink, RPR CRR
                             1005 U.S. Courthouse
22                           300 S. Fourth Street
                             Minneapolis, MN 55415
23

24        Proceedings recorded by mechanical stenography;
      transcript produced by computer.
25

1          **(November 30, 2010, 9:45 a.m.)**

2          THE COURT:  This is the matter of United States

3    versus Nathan Daniel Jesh.  And may I have appearances,

4    please.

5          MR. KOVATS:  Your Honor, Charles Kovats for the

6    United States.  Good morning.

7          THE COURT:  Good morning.

8          MR. NORRIS:  Good morning, Your Honor, Lyonel

9    Norris here with Mr. Jesh.  The record should reflect that

10   Mr. Jesh is present in the courtroom and prepared to

11   proceed.

12         THE COURT:  Mr. Jesh, do you want to raise your

13   right hand, please.

14                **NATHAN DANIEL JESH SWORN**

15         THE COURT:  The reason I just swore you in, you're

16   going to be asked a number of questions, first by the

17   prosecutor, maybe your own counsel, but certainly by the

18   Judge.  I want to make sure you give truthful and honest

19   answers to those questions.  And I should warn you, now that

20   you've been sworn, it would be another offense if you did

21   not.  Do you understand that?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Go ahead.  Mr. Kovats, I know you've

24   done a plea with me before, so you know how I go about it.

25   In this case, I think Mr. Jesh has not been arraigned, so

1  would you take care of the technical details, not

2  necessarily asking him how he pleads, because that will come

3  later, but waivers and those kinds of things, if you would.

4          MR. KOVATS:  Yes, Your Honor.

5  BY MR. KOVATS:

6  Q    First, a Grand Jury has returned a second superseding

7  indictment that names you as a defendant.  Have you had an

8  opportunity to see this charging document?

9  A    Yes.

10 Q    Okay, and you reviewed it?

11 A    Yes.

12 Q    Do you understand the charges?

13 A    Yes.

14 Q    Count 1 charges a conspiracy to commit mail fraud and

15 wire fraud in violation of Title 18, United States Code

16 Section 371.  Do you understand that?

17 A    Yes.

18         THE COURT REPORTER:  Mr. Kovats, can you speak up?

19         MR. KOVATS:  I will.

20         THE COURT:  I don't know what's going on, I hear

21 myself beautifully here, but I'm not hearing you.  You may

22 have the same problem.  Is it absorbing the sound here?

23 This is an unusual courtroom for us.

24         MR. KOVATS:  I'll speak up, Your Honor.

25         THE COURT:  Okay, good.  It sounds as though

1    you're coming from the back of the room, doesn't it?  It may

2    be just the way they set this courtroom up.  Thank you.

3    BY MR. KOVATS:

4    Q    You're charged in Counts 2 through 6 with a violation

5    of Title 18, United States Code, Sections 1343 and Section

6    2.  Do you understand that?

7    A    Yes.

8    Q    And then you're charged in Count 7 through 11 with

9    violations of Title 18, United States Code, Sections 1341

10   and 2, which is mail fraud.  Do you understand that?

11   A    Yes.

12   Q    Do you have any questions about what you're charged

13   with in the second superseding indictment?

14   A    No.

15   Q    Now, you have entered into a plea agreement with the

16   United States and I'm -- I have before me a copy of that

17   agreement.  Have you had a chance to review it with your

18   counsel?

19   A    I have, yes.

20   Q    And on page 11, we have a copy here that the parties

21   have signed, and does that contain your signature?

22   A    Yes, it does.

23   Q    And the signature of your counsel?

24   A    Yes.

25   Q    I'm going to go through the plea agreement and the

1    sentencing stipulations with you at this time.

2        First, as you have agreed with the Government, you have

3    agreed to plead guilty to Count 1 in the second superseding

4    indictment, which charges you with conspiring to commit mail

5    and wire fraud; namely, a mortgage fraud scheme in violation

6    of Title 18, United States Code, Section 371.  Do you

7    understand that?

8    A    Yes.

9    Q    All right.  Now, we'll go back to the factual basis in

10   a bit.  But what I'm going to do now is I'm going to jump

11   ahead to page 4 and talk about the penalties that attach.

12       The maximum penalties for the violation of the charge

13   to which you're pleading, and that includes a term of

14   imprisonment for up to five years, a criminal fine of up to

15   $250,000 or twice the amount of the gain or loss resulting

16   from the offense, a term of supervised release of up to

17   three years, a special assessment of $100, which is payable

18   to the Clerk of the Court prior to sentencing.  Do you

19   understand these statutory penalties?

20   A    Yes.

21   Q    Now, I want to talk to you about supervised release and

22   the revocation of it.  Do you understand that at sentencing

23   you'll be sentenced -- you could be sentenced to a term of

24   supervised release during which you'll be having to live

25   underneath various restrictions and requirements.  Do you

1    understand that?

2    A    Yes.

3    Q    And that if you violate those restrictions or

4    requirements, that your supervision may be revoked.  Do you

5    understand that if you were to violate any of those

6    conditions of supervised release, you could be sentenced to

7    an additional term of imprisonment up to the length of the

8    original supervised release term, subject to the statutory

9    maximum set forth by statute.  Do you understand that?

10   A    Yes.

11   Q    Now, you and the United States have agreed that there

12   are certain guideline calculations that we believe apply and

13   there's some that we don't necessarily come to an agreement

14   upon, but the Government has one position and you have the

15   other.  Have you had a chance to review these with your

16   counsel?

17   A    Yes, I have.

18   Q    All right.  Now the parties have agreed in paragraph

19   5(a) that the offense level is 6 under United States

20   Sentencing Guideline 2B1.1.  Do you understand that?

21   A    Yes.

22   Q    And then there's some specific offense characteristics.

23   The first that applies, it results to the loss amount.  The

24   Government believes that the loss amount is between seven

25   and $20 million and, therefore, the offense level should be

1   increased by 20 levels.  Do you understand that?

2   A    Yes.

3   Q    Now, you're taking the position that the loss amount is

4   less than that, that it's been two and a half and

5   seven million, and that this is based on the value of the

6   funds involved in transactions that were not disclosed by

7   you at closing, and this would result in an offense level

8   increase by 18.  Is that right?

9   A    Yes.

10  Q    Now, do you understand that the Court is going to

11  determine that appropriate loss calculation?

12  A    Yes.

13  Q    That we think -- the Government thinks it's one thing

14  and you think it's the other, but it's up to the Court to

15  make that decision.

16  A    Yes.

17  Q    All right.  Now, the Government also believes that the

18  offense level should be increased by four levels because of

19  the number victims involved.  The Government thinks there

20  were 50 or more victims, and you reserve the right to argue

21  that that does not apply at all.  Does that make sense?

22  A    Yes.

23  Q    Again, it's up to the Court to determine whether or not

24  there should be an adjustment for the number of victims?

25  A    Yes.

```
1   Q    All right.  Now, under paragraph 5(c) there's a

2   discussion that relates to your role in the offense.  The

3   Government believes that the offense level should be

4   increased by two levels because the Government believes that

5   you held and abused a position of private and public trust;

6   namely, as a closer.

7        Again, you reserve the right to argue that this does

8   not apply and there should not be an increase based on the

9   position you held.  Again, this will be up to the Court to

10  determine whether or not that two-level increase applies.

11  Do you understand?

12  A    Yes.

13  Q    All right.  The Government believes that the offense

14  level should be decreased by two levels because the

15  Government believes you played a minor role in the

16  conspiracy.  The defendant, you, are reserving the right to

17  argue that, in fact, a four-level reduction is warranted

18  because you had a minimum role.  Do you understand that?

19  A    Yes.

20  Q    Again, it's up to the Court to determine how to

21  evaluate your role, and whether to give two levels or four

22  levels or something in between.  Does that make sense?

23  A    Yes.

24  Q    Now, the Government agrees that you deserve and you

25  should receive a three-level reduction for acceptance of
```

 1    responsibility, but that recommendation is conditioned upon

 2    a few things.  The first is that you testify truthfully here

 3    today; the second is that you cooperate with the probation

 4    office when they prepare a presentence investigation; the

 5    third is that you accept responsibility and you notify any

 6    lender of any false statements made by you; and fourth, that

 7    you comply with the agreement and you identify any assets or

 8    make any good-faith efforts to make restitution to the

 9    victims.  Does that make sense?

10    A    Yes.

11    Q    Do you understand those things?

12    A    Yes.

13    Q    All right.  Now, Criminal History Category, your

14    counsel and the Government believe that your Criminal

15    History Category is I, which is the lowest, because we don't

16    believe you have any criminal history.  Do you understand

17    that?

18    A    Yes.

19    Q    Of course, the probation office is going to do an

20    examination of your criminal background and if something

21    surfaces, your criminal history score could be increased.

22    Does that make sense?

23    A    Yes.

24    Q    And even if it does increase, that's not a basis to

25    withdraw from the plea agreement.  Do you understand that?

1    A    Yes.

2    Q    And ultimately again, it's up to the Court to determine

3    what your criminal history score is.  Does that make sense?

4    A    Yes.

5    Q    All right.  Then we come to a guideline calculation.

6    If your offense level is 27, which assumes a two-level

7    reduction for the defendant's minor role and a criminal

8    history score of I, your guideline range would be 70 to 87

9    months, but it's limited by the statutory maximum that could

10   be imposed of 60 months.  So that would be -- that's your

11   worst-case scenario as far as the sentence.  Does that make

12   sense?

13   A    Yes.

14   Q    Now, if the Court should accept your loss calculation

15   and your role in the offense adjustment and your criminal

16   history score is I, your range of imprisonment would be 46

17   to 57 months.  Does that make sense?

18   A    Yes.

19   Q    And then there's a fine provision.  If your offense

20   level is 27, a recommended fine would be 12,500 to $125,000.

21   Does that make sense?

22   A    Yes.

23   Q    Now, all of that -- let me hold off on that.

24   Supervised release, the guidelines recommend a term of

25   between two and three years of supervised release.  Do you

1    understand that?

2    A    Uh-huh.

3    Q    And then you have reserved the right to make arguments

4    to the Court that the Court depart from the guidelines and

5    impose a sentence outside the recommendations that the

6    guidelines suggest.  Does that make sense?

7    A    Yes.

8    Q    And with all of that in mind, that is what we talked

9    about along the way, that these stipulations and agreements

10   we make about the guidelines aren't binding on the Court,

11   and that their application is something that's solely within

12   the Court's discretion.  That all of this is totally up to

13   the Court and we may make our arguments or recommendations

14   to the Court about what applies and what doesn't apply, but

15   ultimately it's the Judge's decision about your guideline

16   calculation and, moreover, your sentence.  Does that make

17   sense?

18   A    Yes.

19   Q    Again in paragraph 7 it talks about a special

20   assessment.  You will have to pay a special assessment in

21   the amount of $100 because you're pleading to one count.

22   Does that make sense?

23   A    Yes.

24   Q    All right.  As far as restitution, you understand that

25   the mandatory victim restitution act applies and the Court

1   is required to order you to pay restitution to the victims

2   of your crime.  Do you understand that?

3   A    Yes.

4   Q    And you've made a special reservation here that you

5   agree to argue that the restitution burden that you owe or

6   the amount of restitution that you owe, should be limited to

7   the amount of loss calculation that's determined by the

8   Court.  Do you understand that?

9   A    Yes.

10  Q    All right.  You also represent that you'll disclose to

11  the U.S. Attorneys Office the existence and location of any

12  assets that you have right or title or interest in.  Do you

13  understand that?

14  A    Yes.

15  Q    And then there's a forfeiture provision that the

16  Government is reserving its right to proceed against any of

17  your assets, if those assets represent real or permanent

18  property involved in violation of the laws or proceeds from

19  the violation of the law.  Does that make sense?

20  A    Yes.

21  Q    You've also agreed to cooperate with the United States,

22  and this cooperation includes, but is not limited to, being

23  interviewed by law enforcement agents, submitting to a

24  polygraph if the Government believes it's appropriate, and

25  testify truthfully at any trial or any proceedings involving

1   other suspects.  Do you understand that?

2   A    Yes.

3   Q    And you agree to do that?

4   A    Yes.

5   Q    You agree to cooperate fully and truthfully as required

6   by the agreement?

7   A    Yes.

8   Q    Okay.  And with that agreement and your participation

9   in it, you have the opportunity to provide substantial

10  assistance to the Government.  And if you do provide

11  substantial assistance to the Government, the Government may

12  make a motion under Section 5K1.1 of the guidelines for a

13  reduction of sentence to the Court.  And whether or not the

14  Government makes that motion is solely within our

15  discretion.  Does that make sense?

16  A    Yes.

17  Q    That you may think, hey, I did something for

18  Government, but if we don't think you provided substantial

19  assistance, we may not make the motion.  Does that make

20  sense?

21  A    Yes.

22  Q    And even if we do make the motion, whether or not the

23  Court credits your assistance, again, is totally up to the

24  Court.  That even if the Government makes a motion and says,

25  hey, we think you should credit because he provided

1    substantial assistance, it's up to the Court to determine

2    whether or not your sentence should be reduced.  Does that

3    make sense?

4    A    Yes.

5    Q    Now, if the Government elects not to make a motion

6    under 5K1.1, that's not a basis to withdraw from the

7    agreement.  Do you understand that?

8    A    Yes.

9    Q    Now, there's a waiver of appeal that is contained in

10   here.  And in exchange for the agreements that we've made in

11   the plea agreement, you waive your right to appeal except

12   the length of your sentence if it exceeds 36 months of

13   imprisonment.  Do you understand that?

14   A    Yes.

15   Q    The 36 months is a triggering point; that if you get

16   more than that, you reserve your right to appeal your

17   sentence, if you get less than that, you don't.  Do you

18   understand that?

19   A    Yes.

20   Q    All right.  Now we're going to go through and talk

21   about the factual basis.  And this is -- in essence, this is

22   the set of facts that we've agreed to that describes your

23   role in the offense, all right.

24        It indicates that from approximately 2004 to 2007, you

25   were a closing agent of residential property transactions

1    while working for Total Title, LLC, is that true?

2    A    Yes.

3    Q    And at the time you were a licensed notary public, is

4    that true?

5    A    Yes.

6    Q    And while as an employee of Total Title, you worked for

7    Thomas Balko, among others?

8    A    Yes.

9    Q    All right.  Now, during that time frame, do you agree

10   that you conspired and agreed with other individuals to

11   execute a scheme or a plan to defraud and to obtain money by

12   means of false and fraudulent pretenses?  Is that true?

13   A    Yes.

14   Q    That's a general statement, but specifically during

15   that time frame, T.J. Waconia, or a related company owned by

16   Jon Helgason and Thomas Balko, purchased over 350 properties

17   principally in North Minneapolis.  Then both Helgason and

18   Balko would resell the property within a few weeks to an

19   investor recruited by them or an associate at a substantial

20   profit.  Do you understand that?

21   A    Yes.

22   Q    Okay, is that true?

23   A    Yes.

24   Q    Now, oftentimes, T.J. Waconia or related company would

25   resell the property at a price that was 30 percent higher or

1    more than the price of T.J. Waconia or a related company had

2    purchased the property after owning the property for a

3    matter of weeks.  Do you understand that?

4    A    Yes.

5    Q    Okay.  Is that true?

6              MR. NORRIS:  May I inquire just briefly?

7              MR. KOVATS:  Yes, you can.

8    BY MR. NORRIS:

9    Q    Mr. Jesh, during these preliminary transactions, were

10   you aware that these properties were being resold at profit

11   margins this high?

12   A    I didn't pay attention to it, no.

13   Q    Okay.  So, this was going on, but you don't have any

14   reason to disagree with the Government's analysis here, but

15   you weren't a party to this piece of the transaction?

16   A    Correct, correct.

17             MR. NORRIS:  Okay.

18   BY MR. KOVATS:

19   Q    Okay.  And so, I guess we can treat what I've already

20   described as sort of a background; that you know this to be

21   true, but you weren't necessarily a participant, and you may

22   not even known it at the time?

23   A    Correct.

24   Q    Okay, but you now know it standing here today?

25   A    Correct.

1    Q    Okay.  All right, now going forward, investors were

2    told by Helgason and Balko that the investor was lending his

3    or her credit to T.J. Waconia in exchange for what the

4    investor would receive a payment at closing, typically

5    $2,500.  Is that true?

6    A    Yes.

7    Q    And that's something that you were aware of, is that

8    right?

9    A    Yes, yes.

10   Q    Now, during the two-year period during which the

11   investor owned the property, T.J. Waconia or related company

12   was responsible for all of the payments and maintenance of

13   the property.  Is that true?

14   A    Yes.

15   Q    And you knew that to be true?

16   A    Yes.

17   Q    And Helgason and Balko working through T.J. Waconia or

18   related companies, were to make payments to the investor

19   equal to the mortgage payment on the property so that the

20   investor was to have no financial obligations for the

21   property.  Do you understand that to be true?

22   A    Yes.

23   Q    Now, Helgason and Balko also made arrangements for the

24   seller of the property, T.J. Waconia or related company, to

25   provide the investor with the funds to pay the buyer's

1    portion of the property purchase price or the down payment.

2    Do you understand that?

3    A    Yes.

4    Q    Okay.  And you understand that was going on at the

5    time?

6    A    Yes.

7    Q    Now the loan documents utilized for the transaction

8    fraudulently indicated that the funds were provided by the

9    buyer.  Okay, is that true?

10   A    Yes.

11   Q    And then the HUD I and various other documents

12   associated with the transaction?

13   A    Yes.

14   Q    And they concealed this fact, is that true?

15   A    Yes.

16   Q    All right.  And you acknowledge that the lenders do

17   require that buyers use some amount of personal funds to

18   purchase real property to satisfy underwriting and credit

19   worthiness requirements for approving the loan.  Is that

20   right?

21   A    I do now, yes.

22   Q    Okay.  Now, throughout this scheme, Helgason and Balko

23   on behalf of the investors obtained approximately 7 to

24   $8 million in loan proceeds to purchase the properties from

25   T.J. Waconia.  Now, that's something you did not know at the

1  time, but you now know to be true?

2  A   Correct.

3  Q   Okay.  Ultimately the scheme collapsed and T.J. Waconia

4  or related companies did not repurchase properties or

5  continue making payments to investors for making payments

6  toward the mortgages.  And, in fact, that's true, is that

7  right?

8  A   Yes.

9  Q   And some family members of yours sort of felt the

10  effect of that, is that right?

11  A   Correct.

12  Q   Now, during this time while acting as a closing agent

13  and at the direction of Helgason and Balko, you agreed to

14  close at least 175 real estate transactions, is that

15  correct?

16  A   Yes.

17  Q   And at the time, you knew that some loan applications

18  had been fraudulently completed on behalf of the buyers or

19  investors, is that true?

20  A   Yes.

21  Q   And you also knew that the seller was providing the

22  buyer/investor with the funds to pay the purchase price, in

23  other words, the down payment, as well as other financial

24  incentives like the $2,500 payment that were not reflecting

25  -- reflected on the closing documents?

1    A    Correct.

2    Q    Such as the HUD I, is that right?

3    A    Correct.

4    Q    And you acknowledge that the closing documentation

5    fraudulently concealed the true nature of the transaction,

6    is that true?

7    A    Yes.

8    Q    And it's also true that, despite what we've talked

9    about, you did not profit from the transactions other than

10   maintaining your job at Total Title and drawing your salary

11   from them?

12   A    That's correct.

13   Q    And then, finally, you acknowledge that it was

14   foreseeable to you that United States Mail or a private or

15   commercial interstate carrier like U.P.S. delivered items in

16   furtherance of this scheme.  Is that right?

17   A    Correct.

18   Q    All right.  Now, I have a -- I'm going to go through

19   some things that relate to your rights if you were not

20   pleading today, if you were going to proceed to trial.

21       First, you have an absolute right not to plead guilty

22   and to persist in that plea of not guilty.  Do you

23   understand that?

24   A    Yes.

25   Q    You have a right to a speedy trial, which means that if

1    we -- if you were not pleading guilty today, you'd have a

2    right to a trial within a short period of time.  Do you

3    understand that?

4    A    Yes.

5    Q    And if you were going to have a trial, do you

6    understand that you would have -- well, there's certain

7    rights that attach to that.  And one is to have your case

8    heard by a jury of 12 impartial people.  Do you understand

9    that?

10   A    Yes.

11   Q    And that by pleading guilty today you're waiving the

12   right to have a jury hear your case?

13   A    Yes.

14   Q    You'd have the right to assistance of counsel at trial.

15   Do you understand that?

16   A    Yes.

17   Q    And so, obviously, Mr. Norris is here today and if you

18   would wish, have him continue to be representing you at

19   trial.  Do you understand that?

20   A    Yes.

21   Q    You would have the right to confront witnesses that the

22   Government would call to testify in your case.  Do you

23   understand that right?

24   A    Yes.

25   Q    You'd also have the right, if you wanted to have

1  witnesses on your behalf, you'd have the right to have the

2  Court's power of subpoena to compel them to come in and

3  speak on -- or to testify.  Do you understand that?

4  A    Yes.

5  Q    You'd also have the right to testify in your own behalf

6  if you wanted to.  Do you understand that?

7  A    Yes.

8  Q    But you also have the right not to incriminate

9  yourself.  So, if you didn't want to testify, no one could

10 make you testify?

11 A    Yes.

12 Q    Okay.  You obviously have the right to be presumed

13 innocent until you were proven guilty.  Do you understand

14 that?

15 A    Yes.

16 Q    And the Court would instruct the jury and they would

17 tell them that you were innocent until proven guilty?

18 A    Yes.

19 Q    Hence, you'd have the power of the Court's instruction

20 in that regard.  Do you understand that?

21 A    Yes.

22 Q    Now, obviously, if your guilty plea here is accepted,

23 there won't be any trial of any kind.

24     Now, the rights I've just described, the right to a

25 jury, the right to confront witnesses, the right to subpoena

1   witnesses on your own behalf, the right to testify if you

2   should wish or the right not to self incriminate yourself,

3   that you'll be giving up those rights if you plead guilty

4   today.  Do you understand that?

5   A    Yes.

6   Q    And you're willing to do that?

7   A    Yes.

8   Q    Do you understand that if your guilty plea is accepted,

9   that there won't be any trial of any kind?

10  A    Yes.

11  Q    Do you understand that if the Court accepts your guilty

12  plea, there won't be any ability to appeal your plea under

13  most circumstances?

14  A    Yes.

15  Q    You've preserved your right to appeal your sentence

16  under that narrow circumstance we've described, do you

17  understand that?

18  A    Yes.

19  Q    But as far as your plea, it would be very difficult for

20  you to appeal it going forward after today?

21  A    Yes.

22  Q    Okay.  I'm going to ask you just a couple of questions

23  about the nature of the plea agreement and the voluntariness

24  of your plea today.  Has anyone made any promises to you

25  other than what's contained in the plea agreement about

1    disposing of your case today?

2    A    No.

3    Q    Anyone made any promises that aren't contained in the

4    plea agreement?

5    A    No.

6    Q    Any threats that have been made against you, either by

7    the Government, it's agents or someone else?

8    A    No.

9    Q    Have you used any drugs or alcohol within the last 24

10   hours?

11   A    No.

12   Q    Are you on any drugs of any kind?

13   A    Just prescription medications.

14   Q    Okay, what kind are those?

15   A    Ritalin and Zoloft.

16   Q    Do they affect your ability to perceive what's going on

17   today?

18   A    No.

19   Q    You're of clear mind today?

20   A    Yes.

21   Q    Okay, and do you understand what's going on?

22   A    Yes.

23          MR. KOVATS:  Your Honor, I think I'll turn it over

24   to you if you have any other questions.

25          THE COURT:  Well, I do, but does counsel for Mr.

1    Jesh have any questions at all?

2              MR. NORRIS:  Just a few.

3              THE COURT:  Why don't you go ahead, please.

4    BY MR. NORRIS:

5    Q    Mr. Jesh, I've represented you from the very beginning

6    of this.

7    A    Yes.

8    Q    And we've had some -- as I say in diplomatic language,

9    frank discussions about how this goes?

10   A    Yes.

11   Q    And we've actually had some disagreements about how to

12   proceed, correct?

13   A    Yes.

14   Q    But over time we've talked through the issues?

15   A    Yes.

16   Q    You have also had an opportunity to meet with the

17   Government to discuss their case and how they see the -- how

18   they see the evidence?

19   A    Yes.

20   Q    Now, do you have any questions now about whether this

21   is the appropriate response to what is happening here?

22   A    No, I do not.

23   Q    Now, just before we came up, I told you that this would

24   likely be the last time that you would have to say, no, I

25   want to go to trial.  Do you understand that once the Judge

1   begins his colloquy, that time will quickly come to an end?

2   A    Yes.

3   Q    Now, we have talked about how I intend to approach this

4   -- approach sentencing in this case?

5   A    Yes.

6   Q    And we've also talked about the fact that the

7   Government has an approach that they will be taking?

8   A    Yes.

9   Q    But in the end, it's up to Judge Doty how this turns

10  out for you?

11  A    Yes.

12  Q    And you've seen the guideline calculations?

13  A    Yes.

14  Q    And you understand that the Judge could say, regardless

15  of what I argue, regardless of what the Government argues,

16  I'm going to send you to prison for 60 months?

17  A    Yes.

18  Q    Now, we've talked about how -- how that might be

19  avoided or the arguments that are going to be involved in

20  that, but the Judge is going to be the final arbiter of

21  that, you understand that?

22  A    Yes.

23  Q    When Mr. Kovats asked you if anyone had made you any

24  promises about how this story ends, no one has made you any

25  promises?

```
 1   A    No.

 2   Q    We've had -- we've talked about suggestions, hopes,

 3   tactics, and strategy?

 4   A    Yes.

 5   Q    But in the end, you do understand that Judge Doty is

 6   going to decide, based on everything the Government says,

 7   based on everything that we say, and whatever the Judge

 8   comes up with on his own, and he will make the best decision

 9   that he can in that.  And if the sentence is longer than 36

10   months, we can take it to the 8th Circuit Court of Appeals

11   and a panel of three judges will hear it.  And they will

12   come -- they will look over Judge Doty's shoulders and say

13   he was either -- he responded appropriately or

14   inappropriately.  But if it's below 36 months, this is all

15   over?

16   A    Correct.

17   Q    Whatever happens will be done?

18   A    Yes.

19   Q    Okay?

20   A    Yes.

21   Q    You're okay with that?

22   A    Yes.

23        MR. NORRIS:  Okay.  Thank you, Your Honor.

24        THE COURT:  All right.  Would you mind moving that

25   microphone over to you.  I'm having a little trouble hearing
```

```
1    you, Mr. Jesh.  I hope it doesn't start doing something
2    different here.
3            Before I get into my colloquy -- before I get into my
4    colloquy I'm going to ask you, though, you have a right to
5    be arraigned under this superseding indictment and do you
6    give that right up?  Have you been told what that means?
7                THE DEFENDANT:  Yes.
8                THE COURT:  Okay, do you want to give that right
9    up or waive it as we call it?
10               THE DEFENDANT:  Yes.
11               THE COURT:  Do you have a written document, an
12   arraignment --
13               THE COURT REPORTER:  Judge.
14               THE COURT:  Are you hearing it, too, still?
15               THE COURT REPORTER:  Yes.
16               THE COURT:  Let me turn this down.  Is that
17   better?  Now I can't hear you.
18               MR. NORRIS:  I will use my outdoor voice, Judge.
19               THE COURT:  Okay, both of you, all of you.
20         By any chance, Mr. Kovats, do you have a written waiver
21   of arraignment or written waiver of the reading of the
22   indictment?
23               MR. KOVATS:  I don't have a written one, Your
24   Honor.  I think we can do it orally.
25               THE COURT:  We can do it orally here on the
```

record.  Mr. Jesh, do you give up your right to have the --
to be arraigned here this morning?  And what that really
means -- go ahead and talk with your counsel, if you want
to.

BY MR. NORRIS:

Q    Mr. Jesh, when an individual is indicted by the Grand
Jury, initially what happens is, you come in to Court and
you enter a plea.  Generally, that's a plea of not guilty.
And what the arraignment is designed to do is first -- in
the first instance, to make sure that you understand that
you've been charged in an indictment.

     Now, we have gone over the indictments, the first --
the first indictment, the first superseding indictment, and
you were arraigned on both of those?

A    Yes.

Q    And we did that over in St. Paul?

A    Correct.

Q    This is the second superseding indictment.  There have
been some changes in the indictment, most notably the
dropping of one of the defendants.  And what the Government
did was they added some specificity to some of the charges?

A    Okay.

Q    Now, and they put things -- these little charts that,
for instance on page 12, they go to what specifically
occurred as opposed to pleading it by statutory language.

1    A    Okay.

2    Q    Because they want you to be on notice of what you've

3    been charged with so that you can generate a defense out of

4    that.

5         Now, you have a right to enter a plea and have the

6    Court read the indictment if that were -- it that would be

7    helpful to you?

8    A    Got you.

9    Q    By waiving arraignment, you are waiving essentially two

10   things.  One is, you are agreeing that you've been through

11   this indictment, you understand what's in it and you

12   understand what you're being charged with.  Is that true?

13   A    Yes.

14   Q    The other thing that you are waiving is the opportunity

15   to say that you are not guilty, which puts the Government on

16   notice that they have to prove their case.  Because we are

17   here today and you are -- with the intent to plead guilty,

18   what the Court is saying is, is there a need for you to say,

19   I'm not guilty.  We all understand, I think, that until you

20   say guilty, you are presumed by the Court, by the

21   Government, by myself to be not guilty.  Is it necessary for

22   the Court to ask you for a plea of not guilty in this

23   instance?

24   A    No, it's not.

25   Q    You understand that you have a right to those twin

1   things?

2   A     Yes.

3          THE COURT:  All right.  I think that probably

4   covers it.  Are you satisfied, Mr. Kovats, that we've

5   covered the technical details of the waiver of the

6   superseding indictment?

7          MR. KOVATS:  I am, Your Honor.

8          THE COURT:  You know, this all may seem like games

9   to you, Mr. Jesh, but unfortunately the technicalities have

10  to be met, and that's why I'm concerned about it.

11     I always ask someone in your presence -- am I getting

12  feedback?

13         MR. NORRIS:  Yes, we are.

14         THE COURT:  Let me turn this all the way down.  Is

15  it getting feedback now?

16         MR. NORRIS:  No.

17         THE COURT:  Let's try it then.  I always ask

18  someone in your position whether you're here voluntarily to

19  plead guilty this morning, are you?

20         THE DEFENDANT:  Yes, I am.

21         THE COURT:  In that sense, has anyone promised you

22  anything other than what's in the plea agreement?

23         THE DEFENDANT:  No, Your Honor.

24         THE COURT:  Or has anyone threatened you or

25  coerced you or done anything to get you to come here against

1   your will?

2          THE DEFENDANT:  No, Your Honor.

3          THE COURT:  Okay.  Now, as you've already been

4   told by counsel, until you say, I plead guilty, you have all

5   of those rights that have been gone over.  Do you understand

6   that?

7          THE DEFENDANT:  Yes, I do.

8          THE COURT:  If you told me right now, I'm a little

9   bit cold footed about all of this pleading guilty stuff, I

10  think I want to think about it some more, we would stop this

11  proceeding, we'd all go our way and you'd have a chance to

12  think about it and decide whether you want to do it.  Do you

13  understand that?

14         THE DEFENDANT:  Yes, I do.

15         THE COURT:  But if we go ahead today, you're going

16  to give up those rights or waive them as we say.  Do you

17  understand that?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Those rights are very meaningful, many

20  of them guaranteed by our constitution and I want to make

21  sure you understand what you're giving up.  One of them is a

22  right to be tried by a jury of 12 people.  Do you understand

23  that?

24         THE DEFENDANT:  Yes, I do.

25         THE COURT:  And that jury would have to all agree,

1   all 12 of them would have to agree that the Government had

2   proved its case beyond a reasonable doubt.  Do you

3   understand that?

4           THE DEFENDANT:  Yes.

5           THE COURT:  And both of those things I just said,

6   unanimous jury and beyond a reasonable doubt are very

7   important rights that you have that you're giving up if you

8   plead.  Do you understand?

9           THE DEFENDANT:  Yes.

10          THE COURT:  Also, you have a right to have an

11   attorney present.  Now, Mr. Norris is a good lawyer, we'll

12   get to that in second, but in case he can't be here, we'll

13   have another lawyer present for you or you'll have a right

14   to hire one, or if you can't hire one, we'll provide one for

15   you.  You'll always have a lawyer here in the courtroom

16   whenever you're here.  Do you understand that?

17          THE DEFENDANT:  Yes, I do.

18          THE COURT:  That's one of rights you have.  Now,

19   talking about Mr. Norris, you know, I see him quite a bit.

20   He's a good lawyer.  I've seen him in all kinds of actions.

21   But the question for you is, is he a good lawyer for you?

22          THE DEFENDANT:  He has been, Your Honor, yes.

23          THE COURT:  Has he answered all of your questions?

24          THE DEFENDANT:  And then some, yes.

25          THE COURT:  Has he told you what he thinks would

1   happen if you didn't plead guilty, went to trial?

2           THE DEFENDANT:  Yes, he has, Your Honor.

3           THE COURT:  Has he also told you what he thinks

4   will happen under this plea agreement?

5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  And you're going to take his advice

7   this morning?

8           THE DEFENDANT:  Yes, I am, Your Honor.

9           THE COURT:  Okay.  I think we've gone over the

10  fact -- is your mind free and clear this morning?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  I would expect you're a little

13  nervous, but other than that, do you understand what you're

14  doing?

15          THE DEFENDANT:  Yes, I do.

16          THE COURT:  Tell me in your own words what you're

17  doing here today?

18          THE DEFENDANT:  I'm pleading guilty today.

19          THE COURT:  To --

20          THE DEFENDANT:  One count of conspiracy.

21          THE COURT:  Okay.  Close enough -- with all of

22  that factual predicate there, I think it's close enough.  Do

23  you think you've answered all of the questions that have

24  been asked you truthfully and honestly today?

25          THE DEFENDANT:  Yes, I do, Your Honor.

1          THE COURT:  Do think you are guilty?

2          THE DEFENDANT:  Yes, I do, Your Honor.

3          THE COURT:  I'm going to ask you then, how do you

4     plead?

5          THE DEFENDANT:  I plead guilty, Your Honor.

6          THE COURT:  I'm going to put this finding into the

7     record.  It is the finding of the Court in the case of the

8     United States versus Nathan Daniel Jesh, that the defendant

9     is fully competent and capable of entering an informed plea

10    and that his plea of guilty is a knowing and a voluntary

11    plea supported by an independent basis in fact containing

12    each of the essential elements.  And his plea is, therefore,

13    accepted and is now adjudged guilty of that offense.

14         I'm going to order that a presentence investigation be

15    made, so I'm not going to accept the plea agreement at this

16    time until that's been done.  We do have a probation officer

17    sitting here in the courtroom.  He's been listening to

18    everything we've said.  I want to make sure you contact him

19    before you leave and cooperate with this investigation,

20    because I'm going to rely on it in sentencing you.

21         After the investigation is done, a written report will

22    be prepared and you will see a copy of that, because

23    Mr. Norris will get it and he'll show it to you.  And the

24    Government gets it also.  You have a chance to object to it

25    or to just correct it.  Mr. Norris knows how to go about

```
 1    doing those things.  The Government gets that same chance.

 2    When all of that's done, then we'll have you back here for

 3    sentencing.  Do you understand?

 4              THE DEFENDANT:  Yes.

 5              THE COURT:  Okay.  I'm going to order that the

 6    plea agreement now be filed.

 7              MR. KOVATS:  May I approach, Your Honor?

 8              THE COURT:  You may.

 9              MR. KOVATS:  Thank you.

10              THE COURT:  Custody is an issue.  What's the

11    Government's view?

12              MR. KOVATS:  Your Honor, the Government does not

13    believe that Mr. Jesh represents either a flight risk or a

14    danger to the community at this time.  So, the Government

15    would recommend that the Court continue him on his present

16    conditions of release until sentencing.

17              THE COURT:  Mr. Jesh, you've been doing what's

18    right since you've been arrested.  I guess probably you

19    thought you were doing what's right up to that time,

20    unfortunately, it was against the law.  But because of that

21    fact and because of the Government's recommendation also,

22    I'm going to make two findings.  One, that I don't believe

23    you're a threat to society at this time; and two, that I

24    don't believe you're a threat to flee our jurisdiction.  And

25    with those two findings in the record, I'm going to continue
```

1   you on your bond.

2        Make sure that you -- I don't know what your bond says

3   as far as checking in with Pretrial Services and those

4   things, make sure you continue to do whatever it requires.

5   And you know, I don't have to tell you I'm sure, that if you

6   screw up and something happens with the bond and you do

7   something against that bond, probably they'll -- the

8   prosecutor, you know, he's a nice guy, he seems to be a nice

9   guy here, but he can be a mean guy, too.  They will just put

10   a call in and we may have to put you in jail.  Do you

11   understand what the consequence is?

12             THE DEFENDANT:  Yes, I do, Your Honor.

13             THE COURT:  Okay.  Is there anything else that

14   should come before the Court in this matter?

15             MR. KOVATS:  Not from the Government, Your Honor.

16             MR. NORRIS:  I have nothing, Your Honor.

17             THE COURT:  Okay.  The Court is the going to stand

18   in recess.

19                      *      *      *

20                  **C E R T I F I C A T E**

21        I, Lorilee K. Fink, certify that the foregoing is

22   a correct transcript from the record of proceedings in the

23   above-entitled matter.

24        Certified by:          s/Lorilee K. Fink
         Dated:  3/24/11        Lorilee K. Fink, RPR-CRR
25